RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0375P (6th Cir.)
File Name: 01a0375p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KEITH VAUGHN; JENNIFER
VAUGHN,
      _Plaintiffs-Appellants,_

      _v._

LAWRENCEBURG POWER
SYSTEM,
      _Defendant-Appellee._

No. 00-5466

Appeal from the United States District Court
for the Middle District of Tennessee at Columbia.
No. 99-00012—Thomas A. Higgins, District Judge.

Argued: August 2, 2001

Decided and Filed: October 19, 2001

Before: BOGGS and DAUGHTREY, Circuit Judges; and
WEBER, District Judge

_____

[*]The Honorable Herman J. Weber, United States District Judge for
Southern District of Ohio, sitting by designation.

1

---

**COUNSEL**

**ARGUED:** Dana C. McLendon, III, Franklin, Tennessee, for Appellants  H. Rowan Leathers, III, MANIER & HEROD, Nashville, Tennessee, for Appellee.  **ON BRIEF:**  Dana C. McLendon, Ernest W. Williams, Franklin, Tennessee, for Appellants.   H. Rowan Leathers, III, Todd C. McKee, MANIER & HEROD, Nashville, Tennessee, for Appellee.

---

**OPINION**

---

BOGGS, Circuit Judge.   Plaintiffs Keith Vaughn and Jennifer Vaughn, former employees of defendant Lawrenceburg Power System ("LPS"), filed an action in Tennessee state court alleging that their terminations from LPS in February 1998 violated their rights under the United States Constitution, pursuant to 42 U.S.C. § 1983, and under the Tennessee Human Rights Act (THRA), TENN. CODE ANN. § 4-21-101 *et seq*.  Specifically, the Vaughns objected to LPS's "anti-nepotism" policy, which requires the resignation of one spouse in the event two employees marry.  They claim this policy is unconstitutional under either rational basis or strict scrutiny review.  They also asserted claims of retaliatory discharge under the THRA and the First Amendment.  The magistrate judge initially evaluating their complaint recommended dismissing all claims.  The Vaughns objected to certain aspects of this report.  The district court adopted the magistrate judge's report in full, and granted summary judgment to LPS in a one-page order in February 2000.  The Vaughns filed a motion to alter or amend judgment under Fed. R. Civ. P. 59, based on our contemporaneous decision in *Sowards v. Loudon County*, 203 F.3d 426 (6th Cir. 2000). The district court was unpersuaded and denied this motion by marginal order in March 2000.  The Vaughns have timely

one employee could not be attributed to another. Further, if Keith had been fired after the meeting, there was only one Vaughn working at LPS, making the anti-nepotism policy also inapplicable as a basis to terminate Jennifer. It is true that under Tennessee law Jennifer generally could have been terminated *without* cause, but there is at least a plausible case to be made that she was terminated only because she was exercising her right of intimate marital association with Keith, which *Sowards* makes protected conduct subject to First Amendment retaliation analysis. *See* 203 F.3d at 432-33.

Unfortunately for the plaintiffs, there is no glimmer of the foregoing argument in their motion, or even their current brief. Yet more fatally, their complaint, the fundamental basis of their action, does not allege a First Amendment retaliatory discharge claim as to Jennifer Vaughn, providing no hook on which to hang a potentially valid *Sowards* retaliation argument. There has been no amendment of the complaint. Given that the only use of *Sowards* that was legally cognizable as part of the Rule 59 motion was one attacking the anti-nepotism policy itself, we may not find a legal error in the motion's denial. Therefore, there was no abuse of discretion by the district court.

### III

For the foregoing reasons, we **REVERSE** and **REMAND** Keith Vaughn's retaliatory discharge claim, under the First Amendment, for further proceedings consistent with this opinion. The district court shall have discretion to allow retroactive amendment of the pleadings to allow Jennifer Vaughn to make a *Sowards* retaliation claim. We **AFFIRM** the dismissal of all other claims of the appellants.

appealed both decisions. We affirm in part, but reverse as to one issue.

### I

Keith Vaughn began work for LPS in 1987, and has worked there in several capacities over a ten-year period. In 1997, he was responsible for maintaining LPS's grounds and buildings. Jennifer Vaughn, née Paige, began working at LPS while in high school, and after her graduation in 1996, started a full-time job as a cashier. During the spring and summer of 1997, Keith and Jennifer became romantically involved. In September 1997, they became engaged.

Unfortunately for the Vaughns, their marriage was against power system policy. The "employment of relatives" or "anti-nepotism" portion of the LPS manual, which it is undisputed that both Vaughns received, reads as follows:

> It is the policy of the System to employ only one member of a family. No immediate relatives of employees, officers, members of the city governing body, by blood, marriage or adoption, shall be employed for permanent positions at the Lawrenceburg Power System. For purposes of this policy, said relatives are as follows: Spouse, parent, child, brother, sister, grandparent, grandchild, son-in-law, daughter-in-law, father-in-law, mother-in-law, brother-in-law, and sister-in-law.
>
> *When two employees working for the Lawrenceburg Power system are subsequently married, one must terminate employment.*

(Emphasis added.) The Vaughns ran afoul of the second part of this section forbidding marriages within the system, which may be termed LPS's rule of "exogamy."

It soon became common knowledge that the Vaughns were to be married. In late September, LPS Superintendent Ronald Cato met with Keith Vaughn, and pointed out the relevant

language just quoted. Over the course of that autumn, Cato met with the Vaughns several times to inform them of the policy and to request that they decide which one of them was going to leave LPS. Cato told them he would need a decision before the marriage took place; he also told them that if they remained unmarried and merely lived together there would be no problem with the exogamy rule. The Vaughns were reluctant to pursue this option, in large part because Jennifer had become pregnant that fall with Keith's son, who was born the following July.

The Vaughns disagreed with the policy's applicability to their situation. Mr. Vaughn knew of three other groups of relatives working at LPS, two brother-in-law/sister-in-law dyads, and a father-in-law/son-in-law pair. Keith Vaughn interpreted the overall anti-nepotism policy as being contravened by the presence of these related co-workers.[1] He states that he so informed Michael Meek, the Administrative Services Manager, who Vaughn claims told him that the other employees were "grandfathered in" and that Vaughn also "should be" grandfathered in. Despite urging from Cato, neither of the Vaughns indicated they would resign. Instead, they took their case to a meeting of the Power Board in mid-December 1998, where Keith argued he should be "treated like everybody else." The Power Board was not convinced by the Vaughns' interpretation, apparently distinguishing between the first part of the employment of relatives policy, which does not mandate termination, and the second part, the exogamy rule dealing specifically with employee intermarriage, which does. The Board also refused to change the rule or make an exception, as Cato informed the Vaughns in late December, when he again demanded a decision.

---

[1] Vaughn particularly focused on the case of Delton Perry and his son-in-law Steve Inman. Perry was a long-time employee, but Inman had started at LPS only in 1984, after the adoption of the policy in 1980. He had married Perry's daughter Anita, although apparently after Inman had already begun his employment. Vaughn interpreted the rule that no more than one relative be "employed" as implicitly requiring Inman to leave.

possibly different legal outcomes create genuine issues of material fact which preclude summary judgment.

### *Motion to Alter or Amend*

Although the district court denied the plaintiffs' motion to alter or amend without giving reasons that allow us to review easily its decision for error, the cryptic nature of the court's action is to a large extent paralleled by the motion itself. Aside from long citations from *Sowards*, some of which are highlighted, the motion contains very little in the way of argument. Its *only* substantive discussion of what meaning it takes from *Sowards* consists of one sentence: "The Court went on to reject the very argument made by the defendant in this case – that there was no interference with the right of marriage because the Vaughn's (sic) ultimately married." An interpretation of the motion based on the citations chosen and highlighted indicates that the plaintiffs were attempting to use the *Sowards* decision to trigger heightened scrutiny of the exogamy rule by arguing that the burden on the right of marriage is sufficient to do so. As discussed *supra*, this misinterprets *Sowards*.

Arguably, in the circumstances of this case one could hypothetically use *Sowards* properly as a precedent for a *retaliation* claim. The defendant's explanation for why Jennifer Vaughn was terminated is logically weak. If she was required to resign by letter, or even by direct communication with Cato, then she was still an employee on the morning of February 9 and would have had to have been separated from LPS by involuntary termination. The termination letter indicates this was indeed LPS's posture. Keith Vaughn's insubordination (or at least the insubordination that provided the marginal difference between his retention and his termination) occurred in Cato's office on the morning of February 9. But Jennifer Vaughn had no part in this, making it unclear what act of hers provided the key insubordination, since the whole premise of Cato's complaint that "he really needed to hear from her directly" was the idea that the acts of

*Wygant v. Jackson Bd. of Educ.*, 746 F.2d 1152 (6th Cir. 1984), which had upheld such a policy). Prior to a final court determination, but after the school board rejects the employees' challenge to the policy and after the departure of the fellow employee, the superintendent interrogates the protesting employee as to whether he can *now* "fully agree" with the policy. The employee states that although he can "accept" it, he cannot fully agree with it. As a consequence of this dissent, the government terminates the dissenter for "insubordination."

From the current record, read favorably to appellants, we are unable definitively to distinguish Keith Vaughn's circumstances from this constitutionally unattractive scenario. Mr. Vaughn may have in fact admitted that he was too disgruntled to carry on his job as before, providing a basis for Cato to terminate him. *See Connick*, 461 U.S. at 154 (holding that the First Amendment does not require an employer to "tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships"); *Leary v. Daeschner*, 228 F.3d 738. However, provided that one reads the record to show that Vaughn indicated that he would accept the policy, no longer actively oppose it, and keep his opposition private, it is difficult to perceive a legitimate state interest in punishing him, as Cato himself seems to acknowledge.

Crediting Vaughn's account, the conduct that led to Keith Vaughn's firing was his unwillingness to agree fully with the policy. Under the reasoning summarized above, this mental dissent could be interpreted as protected by the First Amendment. Since termination would be enough to chill First Amendment rights, and the termination was a consequence of the protected conduct, a prima facie case of retaliatory discharge has been stated. Under alternative versions of the facts, the above conditions may not hold, and the basis for termination may have been legitimate, because Vaughn's responses may not have been as he now characterizes them. However, these alternate versions with

Jennifer and Keith's wedding day was January 16, 1998. Keith had met with Cato the previous day and said "okay" in response to Cato's request for a decision. But Keith did not then tell Cato whether he or Jennifer would leave LPS. When the couple arrived back from their honeymoon, they found a letter suspending both of them for minium of two weeks, until February 9, 1998 (or until they reached a decision). If during that time they came to a decision, they were to let Cato know. On February 6, 1998, Keith Vaughn met with Ron Cato and told him the couple planned to have Keith, who was paid more than Jennifer, continue working at LPS while Jennifer resigned. According to Mr. Vaughn, Cato responded by asking for a letter of resignation from Mrs. Vaughn, which apparently had not previously been requested. Vaughn states that he told Cato he didn't know anything about a letter, and had just come by to inform Cato of the long-awaited decision. To this, Cato allegedly said "okay."

The following Monday, February 9, Keith Vaughn, but not Jennifer Vaughn, arrived at LPS at 8 A.M. to begin work. Cato called Vaughn and Michael Meek into his office. Fifteen to thirty minutes later, when Vaughn left Cato's office, he had been fired.[2] The parties dispute exactly what was said during the fateful meeting.

According to Vaughn, Cato asked him for a letter from Jennifer, which Vaughn did not have. Vaughn states that he asked Cato whether he needed the letter "for personal reasons or legal reasons." Cato responded: "I take it you don't fully

---

[2]At certain points in its brief, LPS asserts that Mr. Vaughn "voluntarily quit his employment at LPS." (LPS Br. at 20). The very next page, however, notes that "Mr. Vaughn was terminated for insubordination." (LPS Br. at 21). There is persistent equivocation in the appellee's brief on this point. *Compare* "Mr. Vaughn voluntarily quit his employment" (LPS Br. at 6) *with* "Mr. Cato terminated Mr. Vaughn for insubordination. . . ." (LPS Br. at 4). As we must construe the facts in favor of the Vaughns, and in light of the documentary evidence and party admissions of termination, it will be assumed that Keith Vaughn, in any event, left involuntarily.

agree with our policy." Vaughn claims that he responded, "No, sir. I don't fully agree with it, but I accept it because I've got to support – you know, I've got to work and support my family." After this speech, Cato then mentioned the Tennessee right-to-work law, and fired Keith Vaughn.

Cato's contrasting version is that when told again on February 9 of the couple's decision, he said, "I really need to hear it from her." Vaughn offered to call his wife, but Cato states that he refused to accept this and said, "I'd really rather have a letter." Cato then claims to have asked Vaughn: "Would you consider yourself a disgruntled employee?" Cato states that Vaughn replied in the affirmative. Cato then agrees that he mentioned the right-to-work law. Vaughn supposedly asked if he was fired. Cato states that it was *only then* that he said: "[I]f you're going to be disgruntled and upset, you are." Vaughn supposedly responded, "I am, then." Mike Meek remembers Cato's ultimatum as being, "If you're disgruntled to the point that you don't feel like you can carry out your duties, yes, you're fired."

Cato claims that when he mentioned Tennessee law, he was thinking Vaughn would respond differently. According to Cato, "I thought he was going to say, 'Yeah, I can put it behind me, go and do my job.'" Cato had a planned response: "I was setting him up to say, 'Yeah, but we are going to be watching you every day to make sure you are doing your job . . . .'" Cato claims that he did not want Vaughn to quit, but that "I guess I had gotten to where his attitude about this, I thought, he was just trying to push me over it. Felt like I did what I had to do." Cato explained that the issue was that Keith "had a problem with authority. He had a problem accepting this policy." Outside of the policy, Cato had no problem with the Vaughns.

Vaughn, however, flatly denies that he ever said he was a "disgruntled employee" or that he remembers this phrase being used until he saw it in a letter he received after his termination. This letter, dated February 9, explained that the

---

distinguished commentator has interpreted much of the history of First Amendment jurisprudence as the preservation of freedom of thought in various contexts. "By speaking of freedom of thought I wish to push to the fore exactly that which developed First Amendment doctrine . . . seeks to establish; that the state has no business seeking to control – that is, to prohibit or command – the minds of its citizens." Charles Fried, *Perfect Freedom, Perfect Justice*, 78 B.U.L. REV. 717, 723-24 (1998) (*citing Barnette*; *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976); *Buckley v. Valeo,* 424 U.S. 1 (1975); *Texas v. Johnson*, 491 U.S. 397 (1989); and *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992)). As Professor (then Justice) Fried explained: "[F]reedom of thought is the highest order freedom, and limitations on that freedom are the most radical incursions as they limit the process by which we determine whether to *accept* any and all other limitations." *Id.* at 735 (emphasis added).

We hesitate to approve a rule that allows a government official to interrogate individuals about their mental adherence to government policies. Although government as an employer has greater powers over its employees than government as sovereign has over its citizens, *Waters v. Churchill*, 511 U.S. 661, 675 (1994), this does not fully mitigate the danger. Suppose that a public school teacher unsuccessfully fights a "diversity" policy that requires termination of a fellow employee, a policy that a federal court ultimately finds to be constitutional.[8] *Cf. Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 284 (1986) (*reversing*

---

not hurt and control the right of another . . . ." 1 JOHN TRENCHARD AND THOMAS GORDON, CATO'S LETTERS No. 15, at 110 (Ronald Hamowy ed., Liberty Fund 1995) (1755)

[8] This analogy is not a particularly strained one, as the defendant in this case, the Lawrenceburg Power System, has aspects in common with a municipal school system.

on and do his job, it would be all right." However, because Vaughn has not conceded that he admitted on February 9 that his job performance would be affected, we cannot assume that Cato's conduct at that time was governed by the same reasonable attitude he expressed during his deposition.

As is the case with the freedom of intimate association, the constitutional basis for the protection of freedom of thought has never been fully clarified. *See supra* n.6. It undeniably finds its root in the First Amendment, and is undeniably protected, because "at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234-235 (1977) (holding impermissible the compulsion of public employee to give financial support to ideological causes). As Justice Jackson famously wrote, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or *other matters of opinion* or force citizens to confess by word or act their faith therein." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added).

A concern for freedom of thought was present at the time of the adoption of the First Amendment, and this provision is closely associated historically with that concern.[7] Indeed, one

---

[7]As Jefferson wrote in 1789 to encourage the adoption of the Bill of Rights: "There are rights which it is useless to surrender to the government, and which governments have yet always been found to invade. These are the rights of thinking, and publishing our thoughts by speaking and writing; the right of free commerce; the right of personal freedom." Thomas Jefferson, Letter to David Humphreys, *in* 7 THE WRITINGS OF THOMAS JEFFERSON, MEMORIAL EDITION 323 (Lipscomb & Bergh eds. 1903-04). See also the influential pre-revolutionary writings of the pseudonymous Cato: "Without freedom of thought, there can be no such thing as wisdom; and no such thing as publick liberty, without freedom of speech: Which is the right of every man, as far as by it he does

Vaughns had not "fully accepted" the policy, and terminated Keith Vaughn for "insubordination." For good measure, it terminated Jennifer for the same reason, Cato writing that because he did not "yet have a written resignation[,] I have no choice[.]"[3]

In January 1999, shortly before their first anniversary, the Vaughns filed a lawsuit against LPS in the Circuit Court for Lawrence County. The complaint alleged violations of 42 U.S.C. § 1983 based on "the fundamental right of marriage and freedom of association." The complaint also alleged that the policy was selectively enforced against the Vaughns, knowing that a pregnant Jennifer would be the one to leave, and that this constituted discrimination on the basis of sex.[4] The complaint made specific allegations regarding the termination of Keith Vaughn, claiming that such action "constitue[d] a denial of rights, privileges and immunities including freedom of speech under the constitutional laws of the United States." (Compl. ¶ 13). It also alleged that Vaughn had been terminated in violation of the THRA for "opposing a practice declare [sic] unlawful by the Act." (Compl. ¶ 15).

LPS removed the case to federal court and it was referred to Magistrate Judge Griffin. The magistrate judge found the policy not materially distinguishable from the one upheld in *Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996), and also found that "Vaughn's objections to the defendant's no-spouse policy were personal in nature" and were therefore not protected under the First Amendment. Under the same subsection of the report, "D. Retaliation Claim," the

---

[3]During discovery, plaintiffs uncovered a separate draft of this letter. It differs in describing Keith Vaughn's February 9 "attempt to comply with the policy" as his "*grudging* attempt to comply with the policy." (emphasis added).

[4]The Vaughns appear to have abandoned this argument on appeal and did not object to the recommendation of its dismissal by the magistrate judge.

magistrate judge also found that Keith Vaughn was not protected by the THRA because he was not opposing a discriminatory practice, but one that was in fact legitimate.

The plaintiffs objected to the magistrate judge's report. Their "specific objections" were labeled "1. Tennessee Human Rights Act – Retaliation Claim" and "2. The Constitutionality of the Nepotism Provision." In the first of these objections, they argued that the magistrate judge had erred in her interpretation of the THRA because it was (or might be) legally sufficient for an "opposition" claim if Keith Vaughn believed the policy was unlawful. The plaintiffs did not discuss the magistrate judge's resolution of their alternative ground for retaliation, the First Amendment. However, they did assert that the motion for summary judgment on "this issue" should be denied for "the reasons stated in Plaintiffs' Memorandum in Opposition to Summary Judgement[.]" At the end of their objections, they asked the district judge to reject the report and recommendation "to the extent it concludes the nepotism policy is constitutional as applied to the Plaintiffs' [sic] and that the retaliation claim of Keith Vaughn should be dismissed."

Following plaintiffs' objections, the district court, in a one-page order, adopted the magistrate judge's report and recommendation, noting that the "Court has independently reviewed the Magistrate Judge's findings, the objections, response and the entire record." The Vaughns appealed and also filed a motion to alter or amend based on *Sowards v. Loudon County*, 203 F.3d 426, 430 (6th Cir 2000), in which we reversed a grant of summary judgment against a plaintiff alleging retaliation in violation of her rights of intimate association with her husband, a political enemy of her employer. The Vaughns also appeal the court's denial of this motion, which occurred by marginal order.

"nothing in these circumstances . . . suggesting the defendant's actions were an attempt to suppress or 'chill' the plaintiff's First Amendment rights." The magistrate judge does not discuss this conclusion in light of the possibility that the proximate cause of Vaughn's termination was his unwillingness to "fully agree" with the policy. Indeed, the report and recommendation does not discuss Vaughn's deposition account of the final meeting, an account that certainly places in question whether it was indeed his failure to bring a letter that caused his termination. Vaughn's account was a plausible plaintiff-favorable rendition of the key incident, which the court was required to credit for purposes of defendant's motion for summary judgment. Even according to Mr. Cato, had Vaughn replied differently during their discussion, he would not have been terminated despite his failure to bring a letter from his wife.

If one reads the disputed facts about the meeting favorably to Keith Vaughn, there is certainly an argument that when Cato allegedly asked, "I take it you don't fully agree with our policy?" he was attempting to elicit from his subordinate an admission that Vaughn actually *believed* the policy to be *right* as well as authoritative. According to Vaughn, he had substantively complied with the policy by submitting Jennifer's oral resignation as her agent, and he had "accepted" the policy, but he refused to assent fully because he privately believed it to be unfair and/or inconsistently applied.

This appears to implicate the line of First Amendment doctrine dealing with "compelled speech," which is associated with the protection of the freedom of thought. *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (holding that "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all"). Cato has denied that Vaughn's mere expression that "he disliked this policy" was the cause of his termination. In his deposition, Cato stated that "[h]e can do that [dislike the policy] as long as he can do his job. As long as he can . . . go

may impose on the marital relationship, a question that has not yet been fully resolved.

It is therefore arguable that the Vaughns have a "mixed speech case." *See Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001). In *Bonnell*, we wrote that "[a]lthough aspects of Plaintiff's speech involve matters of personal interest where he is speaking regarding a personal grievance as an employee, his speech also involves matters of public interest such that Plaintiff is speaking as a concerned citizen." *Ibid.* (finding professor's speech to be subject to *Pickering* analysis, but outweighed by interest of the employer). Generally, mixed speech cases are difficult to adjudicate without extensive fact-finding because, given that the "employee admittedly speaks from multiple motives, determining whether [the employee] speaks as a citizen or employee requires a precise and factually-sensitive determination." *Ibid.* (citation and internal quotation marks omitted)

In making this factual determination, we generally look to what was said, rather than why it was said. "Whether an employee's statement is predominated by 'the employee's personal interest qua employee' is primarily a content-based inquiry, not an exclusively motive-based inquiry." *Chappel v. Montgomery County Fire Prot. Dist. No. 1*, 131 F.3d 564, 575 (6th Cir. 1997) (quoting *Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989)). "The motive which underlies an employee's statements is a relevant, but not necessarily dispositive factor when considering whether an employee's statements may be fairly characterized as relating to any matter of political, social, or other concern to the community." *Id.* at 576 (citation and internal quotation marks omitted).

The magistrate judge found that it was undisputed that the Vaughns had been recalcitrant in complying with the policy, that Vaughn had been allowed to speak to the Board, and that on February 9 Vaughn "questioned the necessity of his wife submitting a written resignation." The magistrate judge found

## II

### *Standard of Review*

On appeal, the circuit court reviews a grant of summary judgment de novo, using the same Rule 56(c) standard as the district court. *Hansard v. Barrett*, 980 F.2d 1059, 1061 (6th Cir. 1992). The moving party has the initial burden of proving that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). We consider all facts and inferences drawn from the evidence in the light most favorable to the non-moving party. *City Management Corp. v. U.S. Chemical Co.*, 43 F.3d 244, 250 (6th Cir. 1994). However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

We review a trial court's denial of a motion to alter or amend the judgment, pursuant to Fed R. Civ. P. 59(e), for an abuse of discretion. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998).

### *The Constitutionality of the "Rule of Exogamy"*

We must first decide at what "level of scrutiny" to evaluate the challenged provision in the LPS manual. In order to trigger heightened constitutional scrutiny, the challenged portion of the anti-nepotism policy, the exogamy rule requiring termination of employment, must be shown to place "a 'direct and substantial' burden on the right of marriage." *Montgomery*, 101 F.3d at 1124. Our analysis of the case law in *Montgomery* indicated that we would find direct and substantial burdens only where a large portion of those affected by the rule are absolutely or largely prevented from marrying, or where those affected by the rule are absolutely or largely prevented from marrying a large portion of the otherwise eligible population of spouses. *See id.* at 124-25

(quoting *Zablocki v. Redhail*, 434 U.S. 374, 387 (1978), which found such burdens when "'[s]ome of those in the affected class . . . are absolutely prevented from getting married[,]'" and citing *Loving v. Virginia*, 388 U.S. 1, 12 (1967), for the proposition that a burden exists if a rule absolutely prevents individuals to marry members of another race).

All societies structure the fundamental social fact of marriage, restricting to a lesser or greater extent who may marry whom, and these restrictions often have force of law. "Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution." *Maynard v. Hill*, 125 U.S. 190, 205 (1888); *see also Reynolds v. United States*, 98 U.S. 145, 165-66 (1878) ("Marriage, while from its very nature a sacred obligation, is nevertheless, in most civilized nations, a civil contract, and usually regulated by law. Upon it society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal.").

As a general matter, marriage as it was recognized by the common law is constitutionally protected, but this protection has not been extended to forms of marriage outside the common-law tradition. *See Reynolds*, 98 U.S. at 164; *Zablocki*, 434 U.S. at 399 (Powell, J., concurring) (noting that "[s]tate regulation has included bans on incest, bigamy, and homosexuality, as well as various preconditions to marriage," but relying on the Due Process clause to require "justification 'when the government intrudes on choices concerning family living arrangements' in a manner which is contrary to deeply rooted traditions") (quoting the plurality

touches upon matters of public concern. *Id.* at 146. By contrast, a public employee's speech dealing with "matters only of personal interest" is generally not afforded constitutional protection. *Id.* at 147. The Supreme Court has elaborated on this definition by characterizing unprotected speech as that "speech that involves nothing more than a complaint about a change in the employee's own duties [which] may give rise to discipline without imposing any special burden of justification on the government employer." *United States v. National Treasury Employees Union*, 513 U.S. 454, 466 (1995) (citing *Connick*, 461 U.S. at 148-49).

Mixed questions of private and public concern, where the employee is speaking *both* as a citizen as well as an employee, can be protected. If "any part of an employee's speech, which contributes to the [disciplinary action], relates to a matter of public concern, the court must conduct a balancing of interests test as set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968)." *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 412 (6th Cir. 1994); *see also Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 585 (6th Cir. 2000) (a communication made only within an organization does not preclude some aspect of it from touching upon matters of public concern).

Keith Vaughn's objections to the anti-nepotism policy were obviously made in the interest of Jennifer and himself. Arguably, nonetheless, the record indicates that the Vaughns thought (1) that the policy was not being applied correctly, because related coworkers were in fact employed by LPS, and (2) that the policy as applied was unfair to married persons, who were treated differently than the rest of the enumerated relatives. Keith told the Board, for instance, that he wanted them to be "treated like everyone else." The question of how the policy was to interpreted, and whether it was "fair" to treat the Vaughns differently than the other relatives, was something that would certainly have the potential to affect others. More broadly, it "touched on" the important question of what level of intrusion an employer

U.S.C. § 636, and we will treat it as if it had not been waived. *Cf. United States v. Dexter*, 165 F.3d 1120 (7th Cir. 1999) (although the criminal defendant failed to object properly to the magistrate judge's resolution of the issue, because "the government does not raise the waiver issue . . . we will treat Dexter's arguments as if they were not waived.").

### The Compelled Speech of Keith Vaughn

For a public employee to establish a prima facie case of First Amendment retaliation under 42 U.S.C. § 1983, he must demonstrate: (1) that he was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of his constitutional rights. *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000).

For speech to be considered a constitutionally protected activity, the public employee must show that his speech "touched on matters of public concern," and "the employee's interest in commenting upon matters of public concern must be found to outweigh the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Ibid.* (internal quotation omitted). If the plaintiff can make out a prima facie case, the defendants then have the burden of showing, by a preponderance of the evidence, that they "would have taken the same action even in the absence of the protected conduct." *Ibid.* (internal quotation omitted).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Speech that can be "fairly considered as relating to any matter of political, social, or other concern to the community"

opinion in *Moore v. City of East Cleveland*, 431 U.S. 494, 499, 503-504 (1977)).[5] Even with regard to marriages of the type recognized at common law, the type the Vaughns undeniably sought, government will not violate those intimate associational rights of marriage we have deemed derived from the First Amendment,[6] if its restrictions impose only a "non-

---

[5] We recognize, of course, that this area of the law is highly contested and somewhat unsettled. *See Montgomery*, 101 F.3d at 1123 (expressing reservations about the consistency of Supreme Court's tiers of constitutional review in this area); *see also* David D. Meyer, *The Paradox of Family Privacy*, 53 VAND. L. REV. 527, 528 (2000) (arguing that doctrinal confusion has been exacerbated by "refusal to adhere consistently to any single standard of constitutional review"). As viewed by Professor Meyer, "there is broad agreement that the Supreme Court's 'privacy' cases have created a doctrinal 'quagmire.'" *Id.* at 531. Synthesizing commentary on the present state of the law, however, there appears to be at least equally broad agreement that the consistency of a practice inside the domestic sphere with our social and legal traditions often proves to be the key to its constitutional protection. *See id.* at 589 (acknowledging that the Supreme "Court is now firmly committed to the idea that historical consensus regarding the propriety of regulation is relevant to an assessment of its constitutionality"). *See also* RONALD E. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW § 18.28 (3d ed. 1999) (noting focus of jurisprudence on "traditional" family relationships, while pointing out that "the Supreme Court to date has not ruled that *only* traditional family relationships are protected") (emphasis added).

[6] The right of marriage is also sometimes derived from substantive due process. *See Montgomery*, 101 F.3d at 1125. In order to derive such a right from the text of First Amendment, some commentators have pointed to the Ninth Amendment as serving as a rule of construction which allows a broad reading of the constitutional text in order to protect of rights similar in character to those specifically enumerated. *See* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 11-3 (2d ed. 1988). It may be, however, that the extent of the readings authorized by the Ninth Amendment is limited to those similar rights that were recognized as similar at the time the specifically enumerated right was enshrined. *See* n.5, *supra*. Since the right asserted by the Vaughns is undeniably protected by the Supreme Court and this circuit, we need not inquire further into the rationale behind that protection.

oppressive burden on the decision to marry." *Montgomery*, 101 F.3d at 1125.

This case is potentially distinguishable from *Montgomery* in that LPS's exogamy rule requires termination, and the plaintiff-teachers in *Montgomery* were merely required to have one spouse transfer to a different school within the school system. However, this does not change the essential fact that the policy did not bar Jennifer or Keith from getting married, nor did it prevent them marrying a large portion of population even in Lawrence County. It only made it economically burdensome to marry a small number of those eligible individuals, their fellow employees at LPS. Once Jennifer and Keith decided to marry *one another*, LPS's policy became onerous for them, but *ex ante*, it did not greatly restrict their freedom to marry or whom to marry. As a consequence, the exogamy rule in itself must be considered a non-oppressive burden on the right to marry, and so subject only to rational basis review by this court.

*Sowards*, relied on by the plaintiffs, does not change this result. *Sowards* was not based on a challenge to a rule or decision based on marriage *per se*, but to an act of purported retaliation that affected the right of marriage. As noted by both *Montgomery*, 101 F.3d at 1127, and *Sowards*, 203 F.3d at 433, the two types of cases are different, because the first type deals with an attempt to advance legitimate governmental interests, while the latter concerns an alleged intrusion onto a protected right without any policy justification. *See Adkins v. Bd. of Educ. of Magoffin Co.*, 982 F.2d 952, 956 (6th Cir. 1993) (discussed by both *Sowards* and *Montgomery*). The plaintiffs' desire that we revisit *Montgomery* is, of course, impossible at this time, and we decline their invitation to adopt an "undue intrusion" test. (Vaughn Br. at 16).

In order to satisfy rational basis scrutiny, a rule interfering with the right of marital association under the First Amendment must advance a legitimate governmental interest

appellate review; making some objections but failing to raise others will not preserve all the objections a party may have." *Neuman v. Rivers*, 125 F.3d 315, 322 (6th Cir. 1997) (quoting *Kelly v. Withrow*, 25 F.3d 363, 366 (6th Cir. 1994), quoting *Smith v. Detroit Federation of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987)) (internal quotation marks omitted).

Given that the requirement of specific objection is procedural rather than jurisdictional and may therefore be excused, and given the defaults on both sides, the matter is a close one. Our decision is therefore guided by the overall policy of the objection requirement, which is to conserve judicial resources and focus the district court's attention for review on specific areas of disagreement between the parties. *Neuman*, 125 F.3d at 323. In this case, it appears as though no judicial resources were wasted by the failure to object more specifically, as the district court does not appear to have treated the argument as waived, and it made an independent review of the "entire record" and report. When the district court does not itself make use of the objection rule or rely upon it, much of the justification behind enforcement of the rule dissipates. *See O'Neal v. Morris*, 3 F.3d 143, 144-45 (6th Cir. 1993), *rev'd in part on other grounds*, *O'Neal v. McAninch*, 513 U.S. 432 (1995). In their objections, the plaintiffs at least alerted the court that they objected to the report to "the extent it concludes . . . that the retaliation claim of Keith Vaughn should be dismissed." While we have in the past accepted as sufficient arguably inadequate objections under the specific facts of the individual case, *see, e.g.*, *Kelly v. Withrow*, 25 F.3d 363, 366 (6th Cir. 1994), the same admonition applies here as in *Kelly*, "that a concise statement of specific holdings of the magistrate judge to which exception is taken is the preferred and safer course." Because neither the district court, nor defendant until the day of oral argument, treated the claim as waived, and because there was a colorable attempt at an objection, we conclude that acceptance of the issue for appellate review does not undermine the policy or purposes of the Magistrate's Act, 28

appeal. To the extent their motion to alter and amend asserted a retaliation claim for Jennifer Vaughn's discharge, based on her right of intimate association, it will be addressed *infra*, but the following free-speech analysis will be confined to the termination of Keith Vaughn.

However, we must first consider whether the Vaughns have properly preserved Keith's constitutional retaliation claim. The appellee, despite responding to the appellants' brief, has argued only against their claims under the THRA. (LPS Br. at 19-22). It did not respond in any fashion to plaintiffs' current claims that they were engaged in "constitutionally protected activity." (Vaughn Br. at 25). In particular, LPS did not, in its brief, claim that the Vaughns forfeited their federal claim by failing to include discussion of it in their specific objections to the report and recommendation. At oral argument, however, when questioned about the free-speech issue, defendant's counsel asserted that the Vaughns had forfeited or waived this claim after the issuance of the magistrate judge's report.

We need not reward quick-thinking counsel by entertaining grounds brought to our attention for the first time at oral argument. *See Reithmiller v. Blue Cross & Blue Shield*, 824 F.2d 510, 511 n.2 (6th Cir. 1987). It would have been far better for this argument to have been raised in the appellee's brief, which would have, among other things, allowed the Vaughns to respond to this defense in their reply brief. Nevertheless, we must acknowledge that if the defense had been raised, it would have had considerable merit. In their objections to the magistrate judge's report (which rejected both federal and state claims), the plaintiffs exclusively emphasized the THRA in reasserting their retaliatory discharge claim, not raising their constitutional concerns in even a minimal fashion. Consequently, defendant would have a strong argument that the plaintiffs failed to comply with our interpretation of the requirements of Fed. R. Civ. P. 72, which is that "only those specific objections to the magistrate's report made to the district court will be preserved for

and must not be an unreasonable means of advancing that legitimate governmental interest. *See Montgomery*, 101 F.3d at 1130. LPS asserts that its rule exists to (1) prevent one employee from assuming the role of "spokesperson" for both, (2) to avoid involving or angering a second employee when an employee is reprimanded, (3) and to avoid marital strife or fraternization in the workplace. (LPS Br. at 14). These interests resemble those put forward by the defendant in *Montgomery* and found satisfactory. *See Montgomery*, 101 F.3d at 1130. We specifically noted that a government employer may have a legitimate concern about the inherent loyalty that one spouse will show to another, making discipline more difficult. *Ibid*. Therefore, we conclude LPS has demonstrated its exogamy rule advances a legitimate governmental interest.

The Vaughns claim that the rule, even if advancing a legitimate interest, is an unreasonable means of doing so. They point out that the rule does not affect those willing to merely to cohabitate (which in their case would have also involved the bearing of an out-of-wedlock child); the Vaughns note that cohabitating couples may well show a similar degree of loyalty and create the same problems the rule seeks to avoid. However, we rejected the same argument in *Montgomery*. *See id.* at 1131. There is, no doubt, wide variation in the nature and intensity of the relationships one finds among both married and unmarried couples. Yet there is good reason to believe that the level of commitment signified by marriage – and its attendant legal, moral, and financial obligations – marks those relationships in which, on average, there is likely to be intense loyalty. *See ibid.* Whatever the situation may be *de facto*, married and unmarried couples are not the same *de jure*; the law treats them differently, and LPS may do so as well.

The Vaughns raise a better argument by noting again that the consequences to them are inherently more severe than those affecting the couple in the *Montgomery* case. There, one of the married employees was transferred. Here, both the

Vaughns were terminated, and the policy mandated this for, at least, one of them. Although the Montgomerys were forced to bear the economic costs of commuting, the immediate effect there was less than the loss of one spouse's income. In response, LPS points out that they simply do not have the option of having a transfer policy, because LPS is an operation of only 50 to 70 employees, and further separation between the spouses than already existed would not be possible.

Apparently, before relations between Cato and the Vaughns deteriorated, there had been discussion of placing one of them on non-permanent status until they could obtain work elsewhere. The Vaughns do not describe how they believe LPS could have implemented its policy in a less burdensome way. In these circumstances, the rule, once admitted not to interfere directly with the right of marriage, and to advance a legitimate interest, does not seem unreasonable. *Cf. Rosenbarger v. Shipman*, 857 F. Supp. 1282, 1288 (N.D. Ind. 1994) (upholding termination of probation officer who married a sheriff, but limiting approval to the situation of a small law enforcement and court system in a rural county). Therefore, the rule of exogamy in LPS's anti-nepotism policy does not violate the fundamental right of marriage, and summary judgment is appropriate as to the Vaughns' claims advanced on that basis.

### *Retaliatory Discharge – THRA*

Keith Vaughn claimed to have been terminated in violation of not only his right of freedom of speech under the federal Constitution, but also the Tennessee Human Rights Act. His claim under the THRA is difficult to sustain. The Tennessee doctrine of employment at-will recognizes the general right of either the employer or the employee to terminate their employment relationship at any time, for good cause, bad cause, or no cause at all. *See Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997). By statute and case law, however, some restrictions have been imposed upon the right

of an employer to terminate an at-will employee. *See ibid.* An employee-at-will generally may not be discharged for attempting to exercise a statutory or constitutional right or for other reasons that violate a clear public policy evidenced by an unambiguous constitutional, statutory or regulatory provision. *See id.* at 717.

In connection with employment, the Tennessee Human Rights Act prevents "discrimination because of race, creed, color, religion, sex, age or national origin." TENN. CODE ANN. § 4-21-101. The Act also "makes it a discriminatory practice to retaliate against a person because such person has opposed a practice declared discriminatory by" the Act. TENN. CODE ANN. § 4-21-301. It is this latter "opposition" provision that has been asserted by the Vaughns. As the defendant points out, however, this provision is integrally connected to the types of discrimination the THRA has specifically forbidden. Tennessee has not included marital status in its list of forbidden employment classifications, and without an unambiguous provision, it is unlikely that a Tennessee court would abrogate its employment-at-will doctrine. The Vaughns have not alerted to us to any alternate bases for the retaliation claim under the Tennessee constitution, statutes, or case law, and we therefore need not address whether such might exist. Keith Vaughn's claim under THRA was properly dismissed.

### *Waiver of First Amendment Claims*

The Vaughns also claim their discharge violated the federal constitution, basing their argument on our recent clarification of First Amendment retaliation standards in *Thaddeus- X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (en banc). (Vaughn Br. at 25). Although their brief argues that *both* Vaughns were the subject of retaliatory discharge for the exercise of their First Amendment rights, inspection of the plaintiffs' complaint shows that it alleges a violation of free speech rights only as to the termination of Keith Vaughn. The plaintiffs may not without justification argue new issues on