**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0557n.06

Case No. 18-1294

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| SHAWNA HARTWELL, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Nov 05, 2018 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| HOUGHTON LAKE COMMUNITY SCHOOLS | ) | DISTRICT OF MICHIGAN |
| and AMY PETERSON, | ) | |
| | ) | |
| Defendants-Appellees. | ) | O P I N I O N |

**BEFORE: SUTTON, McKEAGUE, and THAPAR, Circuit Judges.**

**McKEAGUE, Circuit Judge.** Shawna Hartwell's story as a teacher at Houghton Lake Community Schools started with family. Her mom's friend got her the job. Hartwell believes her story ended with family as well. She alleges the school fired her because of her relationships with her husband and stepchildren. Finding no evidence to support Hartwell's claim, we affirm the district court's decision to grant summary judgment for the defendants.

I.

In 2014, Houghton Lake Community Schools hired Shawna Hartwell as a probationary teacher. Like most new employees, Hartwell showed promise but struggled with the learning curve. In her first year-end review, Amy Peterson (the school principal) described Hartwell as "an

extremely hard worker" who "will grow to be a great teacher." But having not yet attained greatness, Hartwell received a "minimally effective" score.

Hartwell's second year did not go as smoothly. First, personal issues began to surface. By way of background, Hartwell's husband Scott had joint custody of two children from his previous marriage to Neika King. Both kids were students at Houghton Lake Community Schools, and one attended the school where Hartwell worked. In August 2015, King complained that Hartwell was harassing the children during a summer program at school. Although nothing inappropriate came to light, Peterson advised Hartwell to talk to her stepchildren only during her husband's parenting time. Shortly after the summer-program allegations, King tried to transfer her daughter to another school. Hartwell, however, told a secretary not to send the daughter's records to the new school because her husband was contesting the transfer. The next week, King came to pick up her daughter after school. But her daughter was not in the designated pick-up area because Hartwell had picked her up from her classroom. Trying to address the situation, Peterson told Hartwell that she needed to release the child to King. Hartwell at first refused. The police then came to the school, and Hartwell relented. The next day, Peterson formally reprimanded Hartwell for interfering with the records transfer, refusing to release her stepdaughter to King, and sending a note to another teacher about her stepdaughter after Peterson advised that all communications must come from a biological parent.

Performance issues emerged as well. Peterson observed Hartwell twice during the academic year. After the first observation, Peterson reported that Hartwell had shown progress but needed to improve at instructing her students. The second observation suggested that Hartwell struggled with professionalism, classroom management, and acceptance of feedback. Peterson

then completed Hartwell's second year-end evaluation, and Hartwell again earned a minimally effective rating. But her numerical score dropped from 2.45 to 2.0.

With that in mind, Peterson sent a letter to the school board recommending that it not renew Hartwell's contract because "her services have been minimally effective." Peterson added in a supplemental letter that Hartwell resisted coaching and waited too long to use available instructional aides. She also advised the school board that Hartwell made the school's secretaries uncomfortable when she told them not to comply with King's request to transfer her daughter's records and that Hartwell put the district in legal jeopardy when she refused to release her stepdaughter to a legal guardian. The school board ultimately issued a resolution terminating Hartwell's contract based on "sufficient reason" furnished in Peterson's recommendation.

Following her termination, Hartwell sued Houghton Lake Community Schools and Peterson in her official capacity (collectively, Houghton Lake). In her complaint, Hartwell alleged violations of the First and Fourteenth Amendments. Houghton Lake moved for summary judgment, and the district court granted the motion. Hartwell now appeals.

II.

We review *de novo* a summary judgment ruling. *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013) (citation omitted). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it would establish or refute an "essential element[] of a cause of action or defense asserted by the parties[.]" *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quotation omitted). And a factual dispute is genuine if it is based on evidence that a reasonable jury could use to return a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When reviewing the record, we view the evidence in the light

most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Smith*, 708 F.3d at 825 (quotation omitted).

III.

Hartwell advanced below both an interference theory and a retaliation theory, but she limits her appeal to the retaliation theory. Under that retaliation theory, Hartwell makes one argument: that Houghton Lake fired her because of her relationships with her husband and stepchildren. Hartwell claims that violated her right to intimate association under both the First Amendment and the Fourteenth Amendment. That raises a threshold question. Does the First or Fourteenth Amendment (or both) govern Hartwell's claim? The answer, we conclude, is the Fourteenth Amendment.

Hartwell's right to intimate association stems from *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984). There, the Supreme Court held that the choice "to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State[.]" *Id.* at 617–18. But *Roberts* left unclear which provision of the Constitution protected that right. As time passed, the answer became even less clear. Some cases in this circuit looked at the right under the First Amendment. *See Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 711 (6th Cir. 2001); *Sowards v. Loudon Cty.*, 203 F.3d 426, 432 (6th Cir. 2000); *Adkins v. Bd. of Educ.*, 982 F.2d 952, 955–56 (6th Cir. 1993). Others looked to the Fourteenth Amendment. *See Flaskamp v. Dearborn Pub. Sch.*, 385 F.3d 935, 941–43 (6th Cir. 2004); *Anderson v. City of LaVergne*, 371 F.3d 879, 881 (6th Cir. 2004); *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003); *Corrigan v. City of Newaygo*, 55 F.3d 1211, 1214–15 (6th Cir. 1995). And at least one looked at both. *Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996). Rather than let the confusion continue, we will now try to shed light on which provision of the Constitution protects the right to intimate association.

We start, as we must, with the constitutional text. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I. On its face, that says nothing about associational rights. But implicitly, it says a lot. An individual exercises his right to speak most effectively by combining his voice with the voices of others. *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 68 (2006). And if the government could restrict an individual's right to join others to speak, then it could silence the views that the First Amendment is intended to protect. *Id.* For those reasons, the expressly guaranteed right to speak implicitly protects "the right to associate for the purpose of speaking[.]" *Id.* Intimate associations are associations of a different kind. Individuals enter intimate associations for "emotional enrichment" and to independently "define [their] identity." *Roberts*, 468 U.S. at 619. The First Amendment does not expressly protect those interests, so the right to intimate association does not flow, even implicitly, from the First Amendment's text.

Let's look at the Fourteenth Amendment. There, the Constitution provides that a state must not "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. At first blush, that says nothing about the right to intimate association either. But we are not painting on a blank canvas. The Supreme Court has said that the Due Process Clause contains a substantive component that protects "fundamental rights" not expressly mentioned in the Constitution. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846–47 (1992); *Roe v. Wade*, 410 U.S. 113, 152 (1973). Those rights include the "certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2597 (2015) (citations omitted). The Constitution's text provides little guidance about which rights are fundamental or central to dignity and autonomy, so courts are left to look at what is "implicit in the concept of ordered liberty" and

"deeply rooted in this Nation's history and tradition."  *Id.* at 2618 (Roberts, C.J., dissenting) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)) (collecting cases).

Those principles make clear what *Roberts* did not: the right to intimate association falls under the Fourteenth Amendment.  *Roberts* reasoned based on principles of culture and tradition, autonomy, identity, and ordered liberty.  468 U.S. at 617–20.  With the help of contemporary caselaw, we now know that such reasoning animates substantive due process analysis.  We thus find that *Roberts* recognized the right to intimate association under the Fourteenth Amendment.  Analysis of Hartwell's claim must advance accordingly.

With Hartwell's claim narrowed to the Fourteenth Amendment, we must decide how to analyze that claim.[1]  Our caselaw does not provide a clear answer.  In the intimate-association context, some cases apply a tier of scrutiny.  *See Zablocki v. Redhail*, 434 U.S. 374 (1978); *Vaughn*, 269 F.3d 703; *Montgomery*, 101 F.3d 1117.  Others do not.  *See Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400 (6th Cir. 2011); *Sowards*, 203 F.3d 426; *Adkins*, 982 F.2d 952.  Perhaps that divergence is due to the prior confusion about whether the First or Fourteenth Amendment protects intimate association.  The cases that did not apply a tier of scrutiny generally viewed the right under the First Amendment.  *See Gaspers*, 648 F.3d 400; *Sowards* 203 F.3d 426; *Adkins*, 982 F.2d 952.  And the cases that did apply a tier of scrutiny often viewed the right under the Fourteenth Amendment.  *See, e.g.*, *Zablocki*, 434 U.S. 374; *Flaskamp*, 385 F.3d 935; *but see Vaughn*, 269 F.3d 703.  That distinction would make sense in most contexts.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 386–88 (6th Cir. 1999) (en banc) (explaining the difference between retaliation claims under the Due Process Clause and other provisions of the Constitution).  Yet we cannot rely on it

---

[1] Hartwell advocates for a two-part test adopted in *A.M. ex rel. Youngers v. N.M. Dep't of Health*, 117 F. Supp. 3d 1220 (D.N.M. 2015).  We decline the invitation to stray from Sixth Circuit precedent to adopt a test from the District of New Mexico.

here. At least when it comes to the right to marry, this Court held that a claim should be "reviewed in the same fashion whether advanced on the theory that it violates substantive due process or advanced on the theory that it violates the First Amendment's right to intimate association." *Montgomery*, 101 F.3d at 1131.

To escape the confusion, Hartwell points us to *Gaspers*. There, this Court homed in on the tension between the cases that apply a tier of scrutiny and the cases that do not. To ease the tension, *Gaspers* sorted the cases into two categories. 648 F.3d at 412–13. The first category includes challenges to policies, such as a school rule that a married couple cannot work in the same building. *Id.* at 413. The second concerns challenges to isolated adverse actions not justified or authorized by any preexisting policy. *Id.* Leveraging that distinction, *Gaspers* suggested that we should apply a tier of scrutiny to policy cases and should look directly for causation in isolated-action cases. *Id.* That seems like a clear answer. Not quite. In an earlier case, this Court was unpersuaded that "isolated instances of state action should be treated any differently than broad-ranging state policies." *Montgomery*, 101 F.3d at 1127. On first glance, it looks like *Gaspers* and *Montgomery* reach opposite conclusions.

But further reflection suggests otherwise. Rather than conflicting with precedent, *Gaspers* explains how courts look at a subset of cases under the tier-of-scrutiny framework. A refresher on the analysis helps explain why. When applying a tier of scrutiny, courts are looking for two things: (1) a governmental interest, and (2) appropriate tailoring. In an isolated-retaliation case, the plaintiff claims that the motivation for an adverse action was to punish her for exercising her constitutional rights. That can never be an appropriate governmental interest. *Montgomery*, 101 F.3d at 1127. So some courts first check whether there are enough facts to support the plaintiff's allegations about the state's motives such that summary judgment is inappropriate. If the answer

is yes, those courts then skip the remaining analysis for purposes of summary judgment because the government action cannot survive any tier of scrutiny.[2] *See id.*

That is an efficient way to resolve cases, but it has some unintended effects. First, it changes the order of operations. In most circumstances, a court first determines which tier of scrutiny to apply, next looks for an appropriate governmental interest, and finally checks for proper tailoring. If a court first checks for a retaliatory motive, then it is starting at the second step. And if that analysis resolves the summary judgment motion, then it looks like the court did not apply a tier of scrutiny. As our caselaw shows, that can create doctrinal confusion. That said, we do not disavow the approach. At the end of the day, the outcome is the same. Plus if the evidence shows that the state cannot survive any tier of scrutiny, courts can avoid making other unnecessary decisions. Our aim here is merely to reillumine what has at times been unclear. We always apply a tier of scrutiny to intimate-association cases when legitimate governmental interests at least partially motivate a challenged government action. *Montgomery*, 101 F.3d at 1128. But sometimes we need not apply that framework in detail at the summary judgment stage because there is enough evidence for a reasonable jury to find that the only motivating factor was punishment.

Here, we have an isolated-action case. Hartwell challenges no policy, and Houghton Lake does not contend that a policy authorized the termination. So we check first whether there is sufficient evidence for a reasonable jury to find that Houghton Lake's motivation was to punish Hartwell for her protected conduct. To do so, we see if Hartwell can show that her protected conduct was a substantial or motivating factor of the termination. *See Sowards*, 203 F.3d at 431.

---

[2] By contrast, that move does not happen in policy cases because we know the plaintiff suffered an adverse action because of the policy violation. The plaintiff is thus limited to challenging the constitutionality of the policy, so we proceed directly to applying a tier of scrutiny to that policy.

If she can make the showing, then the burden shifts to Houghton Lake to prove by a preponderance of the evidence that it would have fired Hartwell regardless of her relationships. *Id.*

Hartwell cannot clear the first hurdle. Houghton Lake fired Hartwell through a school-board resolution. To justify that decision, the resolution cites the "conclusions and supporting rationale" in the "administrative recommendation." The administrative recommendation consists of two letters. In the first, Peterson recommends firing Hartwell because "her services have been minimally effective." In the second, Peterson clarifies that Hartwell resisted feedback, delayed using an instructional coach in her classroom, placed the school district in legal peril by refusing to release her stepdaughter to the girl's biological mother, and interfered with the transfer of the stepdaughter's records. Simply put, Houghton Lake fired Hartwell because she performed poorly inside the classroom and acted inappropriately outside the classroom.

Hartwell protests that Houghton Lake did not fire other teachers who received poor evaluations. But for Hartwell, the numbers do not tell the whole story. Unlike other low-performing teachers, Hartwell's resistance to feedback suggested she would not improve with time. Peterson said as much in her deposition. Besides, there is no evidence that other teachers placed the school in legal peril or interfered with administrative affairs. To the extent that Hartwell suggests her constitutional rights protected or justified those actions, we disagree. The Constitution is not a shield for bad behavior in the workplace. Finally, Hartwell points to King's "harassment" of Houghton Lake. That is, King's phone calls and emails to the school to voice concerns about Hartwell's behavior. Those complaints again center on Hartwell's behavior rather than her intimate associations, and are thus ultimately too distinct from Hartwell's protected rights to show causation. Perhaps recognizing that flaw, Hartwell points to a complaint sent a month before the termination. She argues that the "temporal proximity alone is enough to show

[causation.]" Not so. The relevant inquiry is the temporal proximity between the *discovery of protected conduct* and an adverse action. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). The protected conduct here is not King's complaint, but rather Hartwell's familial relationships. And Houghton Lake knew about those relationships before even hiring Hartwell. In sum, a reasonable jury could not find that Hartwell's intimate associations were a substantial or motivating factor of her termination.

Because a reasonable jury could not find that Houghton Lake fired Hartwell for purely illegitimate reasons, we proceed with the tier-of-scrutiny analysis. The first step is to decide which tier to apply. To do so, we examine whether the challenged action directly or substantially interferes with the right to intimate association. *Montgomery*, 101 F.3d at 1124 (citing *Zablocki*, 434 U.S. at 388). If it does, then we apply heightened scrutiny; and if it does not, then rational-basis review is proper. *Id.* "Government action has a 'direct and substantial influence' on intimate association 'only where a large portion of those affected by the rule are absolutely or largely prevented from [forming intimate associations], or where those affected by the rule are absolutely or largely prevented from [forming intimate associations] with a large portion of the otherwise eligible population of [people with whom they could form intimate associations].'" *Flaskamp*, 385 F.3d at 942 (brackets in original) (quoting *Anderson*, 371 F.3d at 882). Houghton Lake did not prevent Hartwell from forming an intimate association. And at most, the action here could be construed as a prohibition on a teacher marrying the biological parent of a child attending the school where the teacher works. That subset of the population is too small to qualify as a direct or substantial interference. *See id.* at 942–943. So we apply rational-basis review.

To survive rational-basis review, a government action interfering with the right to intimate association must be a reasonable means to advance a legitimate governmental interest. *Vaughn*,

269 F.3d at 712. "The means chosen need not be the best for achieving these stated ends, but need only be rational in view of those ends." *Montgomery*, 101 F.3d at 1130 (citing *Interstate Towing Ass'n, Inc. v. City of Cincinnati*, 6 F.3d 1154, 1166 (6th Cir. 1993)).

Houghton Lake can clear that low bar. Hartwell's bad behavior placed the school in legal jeopardy for failing to release a student to her legal guardian, detracted from the school's learning environment, and interfered with the school's administration. So by firing Hartwell, Houghton Lake could reasonably advance its interests in avoiding legal risk, improving the learning environment, and maintaining productivity. Houghton Lake's decision to fire Hartwell therefore survives rational-basis review.

## IV.

In sum, Hartwell tried to turn her employment dispute into a constitutional case because she is married and has children. The Supreme Court has said that the Constitution protects certain intimate associations. But those protections are not a life vest for bad employees. We **AFFIRM**.