RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0207p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

WILLIAM GASPERS; ALDINE GASPERS,

                    *Plaintiffs-Appellees,*

      *v.*

OHIO DEPARTMENT OF YOUTH SERVICES;
OHIO RIVER VALLEY JUVENILE CORRECTION
FACILITY; JAMES HIENEMAN; BARRY
BRAVERMAN,

                    *Defendants,*

THOMAS J. STICKRATH; GENO NATALUCCI-
PERSICHETTI; KEVIN MILLER; ANDREA
MORBITZER; GEORGE OLIVER; TINA
KRUEGER,

                    *Defendants-Appellants.*

No. 09-3829

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 06-00832—Herman J. Weber, District Judge.

Argued: November 30, 2010

Decided and Filed: August 5, 2011

Before: COLE and WHITE, Circuit Judges; O'MEARA, Senior District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jack W. Decker, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. David Torchia, TOBIAS, KRAUS & TORCHIA, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Jack W. Decker, James A. Hogan, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. David Torchia, TOBIAS, KRAUS & TORCHIA, Cincinnati, Ohio, for Appellees.

_____

[*]The Honorable John Corbett O'Meara, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

—————————

**OPINION**

—————————

HELENE N. WHITE, Circuit Judge.  Defendants-Appellants appeal the district court's partial denial of their motion for summary judgment based on qualified immunity in this Section 1983 action brought by the Gaspers, a married couple claiming that William Gaspers was terminated and Aldine Gaspers was demoted and transferred because they were married to each other, in violation of their First Amendment rights. We **AFFIRM** the district court's decision.

**I.**

Plaintiff William Gaspers (William) met plaintiff Aldine Gaspers (Aldine) in March 1996.  Shortly thereafter, William and Aldine began dating, and they married on December 28, 1996.  By the time they were married, William had become a training officer at the Ohio River Valley Juvenile Correctional Facility (ORV), and Aldine had started working as the youth-services administrator for the Department of Youth Services (DYS) at the same facility.

In December 2000, Aldine was promoted to deputy superintendent over direct services.  Approximately four years later, in February 2004, Geno Natalucci-Persichetti, the Director of the DYS at the time, promoted Aldine to superintendent of the ORV. James Hieneman, then-Deputy Director of Institutions at the DYS, also participated in the decision to promote Aldine.  Both Natalucci-Persichetti and Hieneman were aware that Aldine was married to William, and because William would report directly to Aldine following her promotion, they discussed with Aldine during her interview for the superintendent position foregoing the normal lines of authority and using a "dotted line table of organization" – "a set of arrangements where [William] would not report to

[Aldine] but instead would have a chain of command that led elsewhere."[1] Ultimately, a system was put into place pursuant to which William "would report up his customary chain of command up to the point of a deputy superintendent," who was Aldine's immediate subordinate. Aldine would be bypassed on the chain of command, with any escalated issue being referred to Hieneman. Aldine also reported to Hieneman, who in turn reported to Natalucci-Persichetti. At the time Aldine was promoted to superintendent, no one at the ORV or the DYS raised any concerns about William working at the ORV while Aldine was superintendent of the ORV.

The first incident relating to Aldine's promotion to superintendent occurred in March 2004. An unidentified person sent a letter to Director Natalucci-Persichetti addressing "our new super," which contained allegations of "back alley bargaining" and the following statements: "We know that you will do whatever you can to justify your move to the top" and "enjoy your new position but when the rest of us look at you with disgust, you know why." This letter seemed to suggest that Deputy Director Hieneman used his position to influence Aldine's selection of two individuals for ORV supervisor positions over other, more qualified persons. One of the individuals selected by Aldine to be an ORV supervisor was Hieneman's son, Larry Hieneman. The author of the letter was never identified.

Shortly after receipt of the letter, flyers containing "[c]omments, derogatory comments, expletives[, and] numerous exclamation marks" were left in various locations at the ORV, including the lobby. The flyers addressed Aldine and Cinda Hershberger, the president of the union[2] at the time, and urged them to "get on with the Pick-A-Post

---

[1]The DYS had a nepotism policy in effect as of August 13, 2005 (this policy replaced a "directive" on nepotism). This policy essentially prevents an employee from supervising or participating in decisions affecting the terms and conditions of employment of another employee to whom he or she is married.

[2]The Ohio Civil Service Employees Association (OCSEA) or (union).

agreement[**3**]for the Liberations [C]omplex." The individual responsible for composing and disseminating the flyers was never identified.

At some point between late March 2004 and May 2004, the cars of several ORV administrative or exempt staff members were "keyed" and damaged. Deputy Director Hieneman's car was the first to be vandalized. Tami Collingsworth, Aldine's administrative assistant, told Aldine that several individuals had commented that "the person parking next to William Gaspers should be concerned that his car is not keyed by mistake." Aldine told Hieneman about these comments and he began an investigation through the DYS's chief-inspector's office. The individual responsible for damaging the cars was never located.

Following the keying incidents, William told Aldine that Carl Robinson, a union local vice-president and ORV employee, called William and informed him that he was "tired of the situation with the Gaspers" and that the union would file a nepotism-related grievance if the Pick-A-Post agreement issue was not settled and if the relationship between Aldine and the union did not change. One allegation prompting the grievance was that William was "throwing his weight around" and "intimidating some of the staff and the kids." Specifically, William "pulled out his badge and showed it to one of the kids and said, do you see this name, do you know who I am?"

On April 2, 2004, David Justice, the union regional field representative, contacted the ORV central office and stated that he was going to the ORV with the purpose of speaking with Aldine regarding "the Liberations Complex, Pick-A-Post, and the alleged nepotism issue." Someone from the central office contacted Aldine and instructed her not to speak with Justice. When Justice arrived at the ORV and was not permitted to speak to Aldine, he "became loud and belligerent, stated that he would . . . file the nepotism grievance . . . if [Aldine] refused to talk to him[,] and slammed the door on his way down the hall." On the same day, union president Hershberger filed a

---

**3**A Pick-A-Post agreement is a local agreement that permits union members to bid on open positions of their choosing and obtain them if they have the most seniority. This agreement was not in place at the time and the union was advocating for its adoption.

grievance concerning nepotism on behalf of the union.  The grievance stated that there was

> a hardship within the institution due to the immediate family relationship of our training officer B.J. [William] Gaspers and our supt. Aldine Gaspers.  Issues and incidents have been raised by the membership.  Myself and Mr. Justice attempted to solve these issues but Mrs. Gaspers refused to meet with the union on them.  Therefore we have no choice but to file.

The remedy sought by the grievance was "[f]or the rules of nepotism to apply and for the direct link of supervisor to be broken."

Mary Ann Krake, the DYS labor-relations officer, resolved the grievance on April 19, 2004, denying the grievance in its entirety and finding that "[t]he union has failed to cite any instances where the relationship of Ms. Gaspers and Mr. Gaspers has presented a hardship on the bargaining unit members."  Krake also described the current reporting structure that was in place for William, which showed that Aldine had no supervisory authority over him.  The grievance was formally resolved pursuant to a settlement agreement entered into by union president Hershberger and the DYS on September 8, 2004.

On July 31, 2004, an article published in the *Columbus Dispatch* noted that the trend of employee transfers from the adult to the juvenile prison systems had "sparked allegations of nepotism."  The article referred to William and Aldine's marriage and stated that the DYS had rejected a nepotism complaint concerning the couple that was filed by the union.  Kevin Miller, the DYS's Chief of Staff, was quoted as saying that the DYS was "not violating any nepotism laws."  Following the publication of this article, the DYS supported Aldine and continued to maintain that "there was no wrongdoing or . . . problem with [Aldine] being superintendent of [the] ORV [while being] married to William Gaspers."

The next significant event – William's termination – took place in late October 2004.  William and approximately six other employees were sent to the Delaware, Ohio training facility to obtain re-certification in emergency-response training.  Prior to

leaving for the training, William went on a family camping trip in Wellston, Ohio, bringing along a small gun for protection. After he returned from the trip, William did not realize that the gun, which was kept in a small leather camera case, was still in his travel bag.[4]

The morning of his trip to the Delaware training facility, on October 26, 2004, William took the travel bag (with the gun still inside), put it in his car, drove to the ORV, transferred the bag into the trunk of a state vehicle, and drove that vehicle to the training facility. He parked on the training- facility grounds and attended the emergency-response training class. That evening, after he had checked into the Delaware Hotel and was getting ready for bed, William opened his travel bag, noticed the camera case, and, upon opening the case, discovered that his gun was inside. He assumed, without checking, that the gun was loaded. William put the camera case with the gun in a night-stand drawer. Although the gun was registered to William, he did not have a concealed-carry permit and he was not authorized to carry a weapon on state property or the ORV grounds. William does not dispute that he "possessed an unauthorized weapon on State property" and "in a State vehicle."

At approximately 6:00 a.m. the following morning, William had to drive an ill employee home. Due to his hasty departure, William forgot the gun and left it behind in the hotel room. Several days thereafter, Human Resources Deputy Director Tina Krueger received a phone call from a training officer at the Delaware facility who informed Krueger that the Delaware Hotel manager called and reported that a gun had been found in a night-stand in the room assigned to William. The hotel manager was very upset, particularly because he had a contract with the ORV and had provided ORV employees with a discounted room rate. After some of the facts of the story had been confirmed, including the fact that William had stayed in the room and had brought his gun onto state property, the chief-inspector's office (which was in the central office and assigned to the DYS) initiated a formal investigation into William's conduct.

---

[4]William claimed that after he returned from the camping trip, his stepdaughter and cousin cleaned out the camper and tossed the camera case containing the gun into William's travel bag, which they then brought into the house, without his knowledge.

On November 3, 2004, William's supervisor told him to report to the central office to speak with Donald Whipple, the DYS Senior Investigator, the following day. When William reported to Whipple's office, Whipple first asked whether William wanted union representation, which William declined. He then asked William whether he owned a gun and if he knew where this gun was located. William said that he did own a gun and that, as far as he knew, it was at home. Whipple showed him a picture of a gun and William acknowledged that it looked like his weapon. At this point, the conversation ended and William went home to try to locate his gun, per Whipple's instructions. When he could not locate it, he called Whipple and told him that the gun was not in his possession.[5]

On November 23, 2004, William received a pre-disciplinary notice dated the previous day that directed him to report to a pre-disciplinary meeting on November 29, 2004. William was charged with a violation of DYS Rule 4.17 (unauthorized possession of a weapon). This violation could result in punishment ranging from a six-day suspension to termination, even for an employee (like William) who had no prior disciplinary history. Joan Olivieri, the Bureau Chief of Personnel, was appointed to serve as the hearing officer for the meeting. William was entitled to answer the charges against him and to present evidence at the meeting.

The pre-disciplinary meeting was postponed by several days and ultimately took place on December 1, 2004.[6] William attended the meeting with Michael Price, his union representative. At the conclusion of the meeting, Olivieri found that there was just cause for discipline for a violation of Rule 4.17.

After William and Price left the meeting, George Oliver, then-Bureau Chief of Labor Relations, called William and Price to his office and offered William a position as a juvenile correctional officer (JCO) at either the Scioto or Circleville correctional

---

[5]William subsequently went to the Delaware Police Department and retrieved his gun. William's actions did not violate any of the laws of the State of Ohio.

[6]On this same date, Natalucci-Persichetti was notified of his removal from the position of Director of the DYS. He was replaced by Thomas Stickrath.

facilities in an effort "to make all this disappear." Oliver also said that "nepotism had been a problem since Aldine had taken the superintendent's role, and had it been left up to [Oliver], [William and Aldine] would not have been allowed to work [at the ORV] from the very beginning." William declined the positions because they were too labor-intensive for someone his age. He also wanted to stay in the area where he lived and worked because his mother was ill and he was her sole care provider. Oliver then stated "well, you can either take that or we're going to fire your ass." Price questioned whether the decision to terminate William had already been made prior to the pre-disciplinary meeting, which Oliver denied. He urged William to consider the offer for "Aldine's sake." William rejected Oliver's offer once again and he and Price left Oliver's office.

By way of explaining his conduct, Oliver stated that he had been directly involved in two incidents where an employee was terminated for bringing an unauthorized weapon onto state property despite having an unblemished disciplinary record and knew of other similar occurrences. He therefore assumed that William was going to be terminated and desired to find another solution. Oliver wanted to explore transfers to locations other than the ORV because "of the awkwardness of the union wanting us to do something about him being at [the] ORV. . . . I thought here was a way to placate the union, maybe salvage [William's] job . . . and resolve that whole thing in . . . just one swift move." Oliver had not been authorized by Director Natalucci-Persichetti to make any specific offers to William, but he felt that he could convince him to go along with his plan despite Natalucci-Persichetti's purported "no tolerance" view on possession of unauthorized weapons by the ORV employees.

Following the pre-disciplinary hearing, Human Resources Deputy Director Krueger spoke to Director Natalucci-Persichetti and recommended that William be demoted or face a serious suspension. Natalucci-Persichetti "expressed the fact that he was adamant about [his stance concerning unauthorized] weapons and [that William] should be [] terminat[ed.]" He then told Krueger "[w]e are moving forward to removal." After speaking with Natalucci-Persichetti, Krueger spoke with Chief of Staff Miller, who confirmed that Natalucci-Persichetti did "not want weapons on state

property for any reason and he [was] adamant about his discipline of violations of that." Krueger instructed a member of her staff to prepare a notice of removal for William that was dated December 8, 2004.   The notice was signed by Natalucci-Persichetti and initialed by Miller.

The grievance process following removal was as follows:  "if the employee files a grievance, they will file it at their site where they were employed.  Generally, removal is . . . immediately advanced to Step 3 because Steps 1 and 2 involve communications with the supervisor."  Step 3 is mediation with a central-office labor officer.  "Step 4 is mediation directed by the office of collective bargaining."

On December 14, 2004, the same day he signed his removal paperwork, William filed a grievance alleging that he was not offered union representation after learning of the charges he was facing, that documents alluded to in Senior Investigator Whipple's investigation were never presented and in fact never existed,[7] that the level of discipline imposed on him was excessive, that he had experienced intimidation, harassment, and coercion following the pre-disciplinary meeting, and that he was removed without just cause.  William requested that his level of discipline be reduced and that he be reinstated to his former position without any loss of seniority or  back-pay.

Barry Braverman, a labor-relations officer for the Division of Human Resources at the DYS conducted a Step 3 hearing on January 12, 2005.  During the hearing, Braverman offered to transfer William to a JCO position at the Circleville Juvenile Correctional Facility or to a correctional-officer position at the Southern Ohio Correctional Facility.[8]  William rejected both of these transfer offers because he felt that these positions were not appropriate for his age and ability level.  At the conclusion of the hearing, Braverman denied William's grievance.  Within two weeks of the Step 3 hearing, OCSEA regional field representative Justice told William that Braverman asked

---

[7] Whipple apparently stated during his meeting with William that he had done a LEADS check on the gun, tracing it to William, whereas a Delaware Police Department officer told William when he claimed his gun that no such check had been conducted.

[8] Braverman had made the same offers to William around the time of William's removal on December 14, 2004.  William rejected these transfer offers.

whether William would be willing to accept any position aside from that at the ORV. William never proposed any alternative positions to Braverman.

The case proceeded to mediation and a hearing was held before mediator Meta Bass Lyons in March 2005. Bass Lyons recommended that William be suspended for six days without pay and be permitted to return to work. The DYS did not accept this recommendation.[9]

On August 8, 2005, arbitrator Robert Brookins held an arbitration hearing. The union had asked Human Resources Deputy Director Krueger to offer William a transfer to another position in lieu of termination. As a result, on the day of the arbitration hearing, Krueger met with William and with representatives from the union and from collective bargaining and offered to suspend William for six days, remove the discipline from his record, and provide him with back-pay for all missed work time not including the six days if he would be willing to transfer to the Delaware training facility. William rejected the offer because he did not want to accept a non-union position from which he could be terminated at will. Krueger indicated that William would have "bumping rights" to fall back into the union and William then suggested that, in that case, he could potentially "bump back" into a position at the ORV. According to William, Krueger stated "oh, no, no, no, that would be winning, and you are not going to win this case."[10]

Following the arbitration hearing, the arbitrator issued his decision on October 3, 2005. The arbitrator concluded that William's termination was "unreasonable, arbitrary, and *not for just cause*." He ordered that William be reinstated pursuant to a two-year last-chance agreement without back-pay.[11] William reported back to work on

---

[9]William contended that either during mediation or a subsequent hearing regarding William's unemployment, Oliver told him " if you keep pushing and you do win this, we will make your wife move."

[10]Aldine observed Krueger exiting this meeting on the day of the arbitration hearing and heard her say "if he thinks he's going to [the] ORV, he's crazy, not while she's there." Aldine believed that "he" referred to William and "she" referred to Aldine.

[11]For unknown reasons, the wording of the arbitrator's award was changed after the award was issued from time served and reinstatement without back-pay to just reinstatement without back-pay. The only practical result of this change was that the suspension remained on William's permanent record.

October 11, 2005. He did not experience any significant adverse actions following his return.

Issues relating to Aldine's demotion and transfer arose several months after William's reinstatement. By early 2005, Thomas Stickrath had replaced Natalucci-Persichetti in the role of Director of the DYS. Stickrath did not have any personal involvement with William's case, although he had been informed of the facts of the case. He expressed that he had a "discomfort in general with having a spouse and a superintendent work at the same facility. It[] [was] a concern about nepotism and the impact on operations and decision making." He did state that, at least initially, he had a very favorable impression of Aldine and her management of the ORV, noting that Aldine "represented herself well in meetings, she seemed knowledgeable, and my visit or visits to the facility [in the first half of 2005] seemed to be positive."

Also in early 2005, Gary Mohr replaced Hieneman as the Deputy Director of Institutions for the DYS. Andrea Morbitzer was the assistant to Mohr and replaced him when he left his position in August 2005. As part of her responsibilities, Morbitzer monitored and supervised the superintendents of all the juvenile correctional facilities.

Deputy Director Morbitzer first visited Aldine at the ORV in early September 2005.[12] While visiting the facility, she saw a youth whom she had gotten to know when she worked as a detention director for Franklin County, Ohio. He looked like he had lost a great deal of weight, and expressed a concern to Morbitzer that he did not know how he could meet staff expectations and move out of the Grant unit, which was an intensive-program unit designed for difficult youths. Morbitzer followed up with Aldine, spoke with her about the Grant unit, and sent her a list of questions regarding the Grant unit. Aldine responded to these questions, but Morbitzer followed up in October 2005 with more questions.

---

[12]Prior to this time, Mohr and Stickrath were considering transferring Aldine to the supervisor position at the Marion facility because they felt that she could improve the operation of that facility. They ultimately selected another candidate, however.

Morbitzer spoke to Stickrath after her visit and discussed her concerns regarding the Grant unit, specifically the fact that it did not appear that Aldine and her deputies visited the unit because they did not document these visits in logs. Use of such logs was implemented shortly thereafter. Additionally, Morbitzer discussed with Stickrath a grievance filed in July 2005 by a youth who had colored his face with a green marker and then complained that Aldine would not permit him to take a shower until some time later and ordered his room to be stripped. Rufus Thomas, the chief inspector, had spoken with Aldine in September 2005 regarding this grievance as part of a routine grievance review and did not initiate an investigation. Morbitzer subsequently spoke with Aldine regarding this incident and told her that although Aldine had followed the correct policies and procedures, she could have explored other alternatives in approaching the situation.

In August or September 2005, Morbitzer was informed that she would have to provide a performance evaluation to every superintendent. The superintendents were directed to prepare a list of goals and their progress with respect to these goals, and Morbitzer was expected to create an improvement plan for the superintendents and meet with them individually. Morbitzer received materials from Aldine in late November or early December, and scheduled their meeting for December 29, 2005.

On December 21, 2005, the so-called "mini-gym incident" took place. Several youths in the Grant unit were making sexually explicit comments to a female JCO. The operations manager on duty ordered the staff to move the most disruptive youths off the unit in handcuffs to the mini-gym around the corner. Youths were also turning on the sprinklers in the adjoining Taft unit and the operations manager allowed them to be taken to the same gym. Several of the youths alleged that the staff were not using proper handcuffing techniques, that they moved the youths too fast around the gym, and that they forced the youths to sing Jingle Bells as they walked around the gym. "One youth alleged that he was pushed up against the wall and that he got a bloody nose because of that."

Aldine was not working on this day, and none of the administrative staff were paged regarding this incident. Aldine first found out about the incident after everyone returned to work following the Christmas holiday and immediately initiated an investigation, which was taken over by the chief-inspector's office. "The chief inspector ultimately concluded that a large number of staff had engaged in improper conduct . . . toward the youth[s] in the mini-gym."

Deputy Director Morbitzer traveled to the ORV with the chief-inspector's office as part of the investigation concerning the mini-gym incident on December 28, 2005. During this visit, she met with Aldine to provide her with her performance evaluation. Although Morbitzer's preliminary evaluation of Aldine reflected "on-target" ratings for all categories, following the mini-gym incident Morbitzer changed the rating for Item Number 7 – development of a program for a highly disruptive population – to "below-target." Morbitzer also added the following comment to the evaluation: "has not maintained oversight with parameters set forth by deputy of director of institutions." She did not discuss these changes with Stickrath.

Aldine appealed the evaluation to Human Resources Deputy Director Krueger in January 2006. At some point after Aldine appealed her evaluation, Stickrath decided to remove Aldine from her position and informed Morbitzer of this decision in early February 2006. Morbitzer initially disagreed with Stickrath's decision. She felt that "Aldine was bright . . . [and] had a lot of stamina." Morbitzer also stated "Ohio River Valley is a far-away place. Aldine had been there for a long time. If we could work with her, we at least [had] somebody we kn[e]w, as opposed to trying to do a search for somebody to go to Ohio River Valley. And, again, I thought that I could really . . . work with her and impress upon her the need to move in accordance [with] the goals of the agency."

Director Stickrath met with Aldine on February 7, 2006 – the same day he changed Aldine's evaluation to reflect an "on-target" rating for Item Number 7[13] – and

_____

**13**He did not recall doing so and never discussed his reasoning for changing Aldine's evaluation with Morbitzer.

informed her that he was going to remove her from the ORV. Stickrath told Aldine that although she had done a good job at the ORV, he was "looking to . . . change the culture at [the] ORV and to take it to the next level." He asked Aldine to remain at the ORV until the completion of an upcoming facility audit and she agreed. Stickrath also spoke with Aldine about her future career plans and offered to make some calls for her when she expressed an interest in working for the parole board.

In May 2006, Director Stickrath told Deputy Director Morbitzer and others that Aldine had been helping bargaining-unit employees with their appeals against the DYS. This information prompted Morbitzer to support Aldine's termination. Stickrath asked Morbitzer to call Art Tate and ask him to become superintendent of the ORV. At approximately the same time, Aldine obtained a policy-staff position with the release authority in the central office of the DYS in Columbus, Ohio and left the ORV.[14]

Tate was disciplined shortly after he became superintendent for engaging in "extremely unprofessional and drunken behavior and submitting billings for reimbursement for alcohol after an . . . American Correctional Association conference . . . in 2004." Fred Nelson was then named the superintendent of ORV and stayed on in this position until mid-2008. Stickrath and Nelson agreed that Nelson should leave his position because he was "struggling" and was unable "to effectuate the permanent change that [Stickrath was] seeking."

After Aldine was removed from her position, several other superintendents (in addition to Tate and Nelson) were disciplined or demoted. Amy Ast was moved from the position of superintendent at the Scioto Juvenile Correctional Facility to a classification-administrator position at the central office in Columbus, Ohio. Ast already lived in Columbus and commuted to work. Shannon Teague, the subsequent Scioto superintendent, was suspended for a period of time for choking her secretary. Beth Oprisch, the superintendent at the Indian River Juvenile Correctional Facility, received

---

**14**She subsequently took a voluntary demotion to an unclassified AA3 position at the DYS Office of Youth Records.

a ten-day suspension for bringing alcohol on state grounds to give to her deputy superintendents as Christmas gifts.

Currently, Aldine works in Columbus and lives there during the week. She stays with her husband in their home on the weekends. It is a two and a half hour drive from her permanent home to her work. Her previous commute was approximately six miles. Aldine is being treated for Graves' disease, an autoimmune disorder that is correlated with stress. She was diagnosed with this disorder in the summer of 2006, although the symptoms first appeared in early 2005.

On December 6, 2006, William Gaspers filed a complaint against the DYS, the ORV, Braverman, Hieneman, Krueger, Miller, Morbitzer, Natalucci-Persichetti, Oliver, and Stickrath, alleging a violation of his First Amendment rights under 42 U.S.C. § 1983. On September 18, 2007, an amended complaint, adding Aldine Gaspers as a plaintiff, was filed. Defendants filed a motion for summary judgment on October 24, 2008. The district court dismissed all claims against the DYS and the ORV and against the individual defendants in their official capacities pursuant to the Eleventh Amendment. *Gaspers v. Ohio Dep't of Youth Servs.*, 627 F. Supp. 2d 832, 849 (S.D. Ohio 2009). The district court also granted summary judgment to defendants Hieneman and Braverman "because plaintiffs . . . failed to produce evidence to show that these individual defendants engaged in any wrongdoing." *Id.*

The district court then examined William's First Amendment retaliation claim and denied qualified immunity to defendants Krueger, Miller, Natalucci-Persichetti, Oliver, and Stickrath. *Id.* at 853. It further concluded that defendants Morbitzer and Stickrath were not entitled to qualified immunity with respect to Aldine's First Amendment retaliation claim based on her transfer. *See id.* at 854. The district court concluded that all the individual defendants were entitled to qualified immunity on Aldine's First Amendment claim based on her testimony at her husband's arbitration hearing. *See id.*

On July 6, 2009, individual defendants Krueger, Miller, Morbitzer, Natalucci-Persichetti, Oliver, and Stickrath appealed the district court's opinion and order.

## II.

The sole issue on appeal is whether the individual defendants are entitled to qualified immunity on the Gaspers' First Amendment retaliation claims. These claims are derived from William's termination from his position as training officer at the ORV and Aldine's removal from her position as superintendent of the ORV and transfer to a position that necessitated relocation to a different city during the work-week.

"Government officials who perform discretionary functions are generally protected from liability for civil damages as long as their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sallier v. Brooks*, 343 F.3d 868, 878 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Because such a decision involves solely a question of law, we review de novo a district court's denial of qualified immunity. *Siggers-El v. Barlow*, 412 F.3d 693, 699 (6th Cir. 2005).

We follow a three-step analysis when reviewing a district court's decision concerning qualified immunity. *See Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). First, we evaluate whether the facts demonstrate that a constitutional violation has occurred. *Holzemer v. City of Memphis*, 621 F.3d 512, 519 (6th Cir. 2010). Second, we determine whether the violation involved a clearly-established constitutional right of which a reasonable person would have known. *Id.* Third, we consider "whether the plaintiff has offered sufficient evidence 'to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Id.* (citations omitted). While conducting this review, we view the facts in the light most favorable to the plaintiff. *Siggers-El*, 412 F.3d at 699.

## A.

To affirm the district court's denial of qualified immunity, we must find that, "[t]aken in the light most favorable to [plaintiffs], . . . the facts alleged show [that the individual defendants'] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A plaintiff alleging First Amendment retaliation under 42 U.S.C.

§ 1983 must prove that (1) she "engaged in protected conduct; (2) the defendants took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was taken at least in part because of the exercise of the protected conduct."**[15]** *Siggers-El*, 412 F.3d at 699 (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 393 (6th Cir. 1999) (en banc)). This inquiry is intensely context-driven: "Although the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting – whether activity is 'protected' or an action is 'adverse' will depend on context." *Thaddeus-X*, 175 F.3d at 388. If the plaintiff establishes a violation, the defendants can avoid liability "by showing that [they] would have taken the same action even in the absence of the protected conduct." *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999) (citations and internal quotation marks omitted).

As a threshold matter, the parties disagree regarding the rule that should apply to First Amendment claims of retaliation affecting the right of marriage. The individual defendants contend that rational-basis scrutiny should apply to their decisions to terminate William and transfer Aldine. They rely primarily on our decisions in *Montgomery v. Carr*, 101 F.3d 1117 (6th Cir. 1996), *Vaughn v. Lawrenceburg Power System*, 269 F. 3d 703 (6th Cir. 2001), and *Beecham v. Henderson County, Tennessee*, 422 F.3d 372 (6th Cir. 2005). On the other hand, plaintiffs argue that for their claims to go forward, they need only demonstrate that they suffered adverse actions because of their marriage.

This court explained in *Vaughn* that cases based on a challenge to a rule or decision based on marriage *per se*, such as an anti-nepotism policy, are different from cases challenging purported acts of retaliation that affect the right of marriage. 269 F.3d

---

**[15]**An inference that the plaintiff's protected activity was at least a motivating factor for the adverse decision may be supported by "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similar individuals." *Arnett v. Myers*, 281 F.3d 552, 560-61 (6th Cir. 2002). "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Where, however, "some time elapses between when the employer learns of protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*

at 712.  The first type of case deals with "an attempt to advance legitimate government interests," necessitating rational-basis review.  *Id.*  By contrast, the second type of case "concerns an alleged intrusion onto a protected right without any policy justification." *Id.*  In the second type of case, "it is not necessary that the governmental act require the abandonment or dissolution of a marriage relationship as the price for retaining public employment.  The right of association is violated if the action constitutes an undue intrusion by the state into the marriage relationship."  *Sowards v. Loudon Cnty., Tenn.*, 203 F.3d 426, 433 (6th Cir. 2000) (citing *Adkins v. Bd. of Educ.*, 982 F.2d 952, 956 (6th Cir. 1993)).  In the second type of case, the loss of a job because of a protected marital relationship "constitutes undue intrusion by the state in that relationship."  *Id.*

Because plaintiffs do not challenge an anti-nepotism policy, but instead allege that they were retaliated against on the basis of their marriage, the *Adkins*/*Sowards* line of cases applies here.[16]  The individual defendants' reliance on *Montgomery*, *Vaughn*, and *Beecham* is misplaced.  *Montgomery* and *Vaughn* involved challenges to anti-nepotism policies.  *Beecham* is distinguishable on the facts; it concerned a deputy circuit-court clerk who was fired for having an adulterous relationship with a married attorney whose wife, a chancery-court clerk, worked  in the same building and on the same floor as the employee who was terminated.  *See Beecham*, 422 F.3d at 374. Courthouse officials terminated the deputy circuit-court clerk because they decided "that it was unacceptably disruptive to the workplace for a woman employed in the office of one of the county's courts to be openly and 'deeply involved in a romantic relationship' with a man still married to a woman employed in the other county court down the hall." *Id.* at 378.

Given these facts, the use of rational-basis review in *Beecham* was proper because the relationship at issue did not constitute an "intimate association."  The right to "intimate association" is not limited to familial relationships but includes relationships characterized by "relative smallness, a high degree of selectivity in decisions to begin

_____

[16]We recently reaffirmed that *Adkins* and *Sowards* apply to First Amendment retaliation claims that are based on alleged governmental interference with the marital relationship where no anti-nepotism policy is involved.  *See generally Cameron v. Grainger Cnty.*, 274 F. App'x 437 (6th Cir. 2008).

and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 620 (1984).  However, we have held that monogamous, rather than adulterous, relationships deserve constitutional protection, as only the former are characterized by "deep attachments and commitments" in which one shares those "personal aspects of one's life." *Id.*; *see also Anderson v. City of LaVergne*, 371 F.3d 879, 882 (6th Cir. 2004) ("Construing the facts in a light most favorable to Anderson, he and Lewis lived together at some point, were romantically and sexually involved, and . . . [were] monogamous in the relationship.  The relationship therefore involved an attachment to an individual with whom Anderson shared the 'distinctly personal aspects of [his] life.'") (citations omitted); *Marcum v. McWhorter*, 308 F.3d 635, 640 (6th Cir. 2002) ("[W]e find that the adulterous nature of the relationship does not portray a relationship of the most intimate variety afforded protection under the Constitution.").  In *Beecham*, the couple did not live together, were plainly not monogamous, and disputed that they had been sexually involved.  *Beecham* is therefore inapposite.

## B.

Turning to the merits of the case, the individual defendants challenge the district court's conclusions that William and Aldine satisfied their burden with respect to their First Amendment retaliation claims, and that issues of fact remain regarding whether the individual defendants would have taken the same actions even in the absence of protected conduct.

The Supreme Court recognized the First Amendment right to freedom of association in intimate human relationships in *Roberts v. United States Jaycees*, 468 U.S. 609 (1984).  In *Roberts*, the Court stated that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty." *Id.* at 617-18.

In *Adkins*, we considered Margie Jo Adkins's claim that she was fired from her position as a high-school principal's secretary by the superintendent of the county school system because the superintendent did not like Adkins's husband, the high-school principal. *See Adkins*, 982 F.2d at 953-54. The superintendent apparently told Adkins "I can't get rid of [your husband,] and you're the next best thing." *Id.* at 954. The superintendent later testified at a deposition that he did not want to extend Adkins's contract because "he could not get a handle on the situation in the high school for the reason that[]Adkins was more loyal to the principal than she was to her job." *Id.* He refused to recommend Adkins for any employment in the school system during the following year. *Id.*

Adkins sued the superintendent and the county board of education under 42 U.S.C. § 1983, claiming that the defendants' actions violated her First and Fourteenth Amendment rights. *Id.* at 953. The district court denied qualified immunity and the case proceeded to trial. A different district court granted a motion for a directed verdict and dismissed Adkins's claims. On appeal, we held that the superintendent's failure to extend Adkins's contract because of her marriage to the high-school principal supported her claim that her constitutional rights were violated. *Id.* at 955.

Subsequently, in *Sowards*, we considered the First Amendment retaliation claim of Wanda Sowards, who was terminated from her position as a jailer at the Loudon County Sheriff's Department (LCSD) after her husband announced that he was running for the position of Sheriff of Loudon County against incumbent Sheriff Timothy Guider. *See Sowards*, 203 F.3d at 430. Sowards alleged that she was disciplined more harshly and was ostracized after her husband announced his candidacy. *Id.* Approximately a year after her husband lost the election, Sowards was terminated allegedly because she had missed an outstanding warrant. *Id.* The ultimate decision to terminate Sowards rested with Guider, who did not conduct an investigation into the incident and fired her based on the chief jailer's recommendation. *Id.* The district court ultimately granted summary judgment in favor of the county and Guider on all of Sowards's claims. *Id.* at 431.

On appeal, we first concluded that, based on *Adkins*, Sowards satisfied the protected-conduct prong of a First Amendment retaliation claim because she "ha[d] the right to associate intimately with her husband, and her marriage relationship [was] protected from undue intrusion by the state" and because Sowards's claim that "she lost her job [due to] her protected marital relationship . . . constitute[d] undue intrusion by the state in that relationship." *Id.* at 433. Second, we stated that Sowards met the adverse-action prong because she was dismissed from her job. *See id.* Finally, we held that Sowards "presented sufficient evidence upon which a reasonable juror could conclude that Guider's decision to terminate Sowards's employment was substantially motivated by her protected First Amendment associational rights." *Id.* at 434. Although the defendants alleged that Guider "did not take Sowards's association with her husband or his political campaign into account in deciding to terminate her employment, Guider made conflicting statements regarding his conduct. Thus, a genuine issue of material fact exist[ed] regarding his true motivation for terminating her employment." *Id.* Additionally, Sowards had been a good employee and had never previously been disciplined for missing a warrant. *Id.* Other LCSD officers had missed warrants and had not been fired. *Id.* This information supported the conclusion that the requisite causal connection existed between the protected activity and the adverse action, and also demonstrated that Guider would not have terminated Sowards on the basis of one mistake in the absence of her protected association. *Id.* at 435.

In light of *Adkins* and *Sowards*, both William and Aldine satisfy the protected-activity and adverse-action prongs of their First Amendment retaliation claims. Both had the right to associate with each other, and their marital relationship is protected from undue intrusion by the state. Further, William's claim that he was terminated and Aldine's claim that she was demoted and transferred on the basis of their protected marital relationship "constitutes undue intrusion by the state in that relationship." *Id.* at 433.

Whether William and Aldine have demonstrated that the relevant adverse actions were substantially motivated by their protected First Amendment associational rights and

whether the individual defendants have presented sufficient evidence that William would have been fired and Aldine would have been demoted and transferred in the absence of their protected association are much closer questions. With respect to William, there is no question that he brought an unauthorized weapon onto state grounds and had the weapon in a state vehicle. This was a terminable offense. Several employees who, like William, had clean disciplinary records and had worked for the state for long periods of time were terminated after committing such an offense. However, at least one of these employees was subsequently reinstated to the same position (another employee's grievance was submitted too late and he lost his right to appeal the decision).

Although William was ultimately reinstated and permitted to work as a training officer at the ORV, there is evidence supporting that the individual defendants attempted to convince William to take less-desirable positions at facilities other than the ORV in an effort to separate him from his wife. Evidence also suggests that the individual defendants may have decided to terminate William rather than suspend him because they knew that they could push him to transfer to another facility, thereby accomplishing their goal of separating William and Aldine. For example, William alluded to at least one individual who brought an unauthorized weapon on state grounds to kill geese in the area and was not disciplined. Further, the DYS did not accept the mediator's recommendation that William receive a six-day suspension for his offense and be permitted to return to the ORV.

William also asserted that Bureau Chief of Labor Relations Oliver told him that if he went to arbitration and won, his wife would be moved. Aldine stated that she heard Human Resources Deputy Director Krueger say that William would not be permitted to return to the ORV while Aldine was there. Essentially, every individual defendant expressed dissatisfaction with William and Aldine working together at the same facility both before William's termination and after his reinstatement, despite that William did not report to Aldine and the couple was not violating any DYS anti-nepotism policy. Thus, William presents sufficient evidence to show that the individual defendants were substantially motivated by his marriage to Aldine in terminating him, and that there is

a genuine issue whether he would have been fired in the absence of his protected association.

Aldine was removed from her position approximately four months after William was reinstated, but she received her first "below-target" evaluation approximately two months after his return. Aldine, like Sowards, had been a very good employee until her removal. Prior to William's reinstatement, Director Stickrath considered transferring Aldine to a superintendent position at a struggling facility because he felt she could improve the operation of that facility due to her talents and abilities. Also like Sowards, Aldine was removed essentially for making one mistake (which could not even be ascribed directly to her),[17] whereas other superintendents have subsequently received short-term suspensions for offenses such as choking an employee and bringing alcohol onto state grounds. Aldine was replaced by an individual who had a history of disciplinary issues even while he was a superintendent at another facility and who left shortly thereafter because of similar issues. The next superintendent "struggled" in his job and also left the position. Significantly, following William's return to the ORV, Director Stickrath acknowledged that he was dissatisfied with the Gaspers working together.

Thus, Aldine presents sufficient evidence to demonstrate that the individual defendants were substantially motivated by her marriage to William in removing her from her position as superintendent of the ORV. Further, the individual defendants have not presented sufficient evidence to show that Aldine would have been demoted and transferred in the absence of her protected association.

## C.

Having found that a constitutional violation has been adequately established, we must next determine whether the constitutional right at issue was clearly established at the time of the violation, *Pearson v. Callahan*, 129 S.Ct. 808, 816 (2009), and whether

---

[17]It is actually unclear whether Aldine was removed specifically because of the mini-gym incident, as Stickrath's only explanation for her removal was that she could not "take it to the next level."

the individual defendants acted objectively unreasonably "in light of the clearly established constitutional right[]," *Feathers*, 319 F.3d at 848 (citation omitted).  "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007) (citation and internal quotation marks omitted).  "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002) (citation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citations omitted).  Public officials could "still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

In *Adkins*, we upheld the district court's determination that a school superintendent was not entitled to qualified immunity based on his termination of one spouse because he did not like (but could not terminate) the other spouse.  We reasoned that "[t]he Supreme Court identified the constitutional right to freedom of association in 'intimate human relationships' as early as 1984, and applied the same reasoning again in 1987" and that "[a]s a public official charged by state law with making discretionary decisions for recommending hiring and other personnel actions to the board of education, it was objectively reasonable to require that [the superintendent] be aware of and observe th[is] constitutional right." *Adkins*, 982 F.2d at 956 (citations omitted).  Similarly, in *Sowards*, we relied on *Adkins* in holding that a county sheriff was not entitled to qualified immunity because his termination of the plaintiff was substantially motivated by her marital association and the plaintiff's "right of intimate association was clearly established by July 19, 1995." *Sowards*, 203 F.3d at 439.

Here, as in *Adkins* and *Sowards*, plaintiffs' right of intimate association was clearly established by the Supreme Court as early as 1984 and by this court as early as

1993 – long before William was terminated and Aldine was demoted and transferred. As a result, it was objectively reasonable to require the individual defendants to be aware of and to observe this constitutional right.

We **AFFIRM**.